ATTORNEY FOR APPELLANT
Kenneth R. Martin
Goshen, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

_____

### In the
### Indiana Supreme Court

_____

No. 20S00-0607-CR-270

SPENSER A. KREMPETZ,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

_____

On Direct Appeal from the Elkhart Circuit Court, No. 20C01-0508-MR-00150
The Honorable Terry Shewmaker, Judge

_____

**August 29, 2007**

**Rucker, Justice.**

**Case Summary**

Spenser A. Krempetz appeals his sentence of life imprisonment without parole (LWOP) after pleading guilty to murder, a felony, conspiracy to commit murder, a Class A felony, and

criminal confinement while armed with a deadly weapon, a Class B felony.  Krempetz presents three issues for review which he phrases as follows:

> 1.    Was there sufficient evidence to establish the two aggravators relied upon by the trial court to support the sentence of life without parole?
>
> 2.    In imposing the sentence of life without parole on the conviction for murder and enhancing the sentences for the other two felonies, did the trial court properly weigh the aggravating and mitigating circumstances?
>
> 3.    Was the sentence inappropriate under Indiana Appellate Rule 7(B)?

We affirm.

**Facts and Procedural History**

Eighteen-year-old Krempetz and his seventeen-year-old girlfriend Hannah Stone, along with a mutual friend, seventeen-year-old Aaron McDonald, devised a plan to rob and kill Stone's mother, Barbara Jo Keim.  Stone conceived of the idea to "get rid of" Keim because she was annoyed that her mother did not approve of her relationship with Krempetz.  McDonald was promised $400 for his efforts.  Stone had recently moved out of her mother's home, and thus Keim lived alone in an apartment in Middlebury, Elkhart County, Indiana.  The accomplices agreed that Krempetz and McDonald would hide in the stairwell located next to the apartment and Stone would knock on the door and ask her mother for clothing.  They knew that Keim would not let them inside if she saw the two young men, especially Krempetz.  Once Keim opened the door, Krempetz would tackle her and McDonald would follow armed with a handgun.  Money obtained from Keim's credit union account would be used to pay McDonald.

The trio proceeded to execute the plan.  On August 4, 2005, the group went to Keim's apartment.  Krempetz and McDonald hid in the stairwell, Stone knocked on her mother's door, and when Keim opened the door, Krempetz ran inside and tackled her.  Armed with a handgun

2

McDonald followed. Krempetz overpowered a screaming Keim, and while McDonald held her at gunpoint, Krempetz bound Keim with duct tape over her arms, eyes, and mouth. In the meantime, searching Keim's purse, Stone retrieved Keim's ATM card. Removing the tape from her mouth long enough to get a response, Krempetz asked Keim about the location of her credit union, her PIN, and the amount of money in her account.

Krempetz and McDonald then drove Keim to the credit union. Stone remained at the apartment because the trio was concerned that someone may have called the police after hearing Keim screaming. The plan was to throw the police off track in the event officers came to check on the incident. Arriving at the ATM McDonald gave his handgun to Krempetz, exited the car, and attempted to obtain $800 or $1000. After two failed attempts McDonald retrieved $200. McDonald returned to the car, and Krempetz drove away. After a period of time that McDonald later testified "felt like hours," Tr. at 51, Krempetz drove to a cornfield in an adjacent county. Barefoot and still bound with duct tape, Keim was marched into the field where Krempetz fatally shot her in the back of the head. McDonald then gave Krempetz the $200. Krempetz kept half and gave the other half back to McDonald.

Within days of these events all three accomplices were arrested and charged as codefendants with Count I murder, a felony; Count II conspiracy to commit murder, a Class A felony; and Count III criminal confinement while armed with a deadly weapon, a Class B felony. The State also requested life imprisonment without parole alleging three aggravating factors: intentional killing while committing or attempting to commit robbery, Ind. Code § 35-50-2-9(b)(1)(G); the defendants committed the murder while lying in wait, I.C. § 35-50-2-9(b)(3); and the defendants committed the murder by hiring another person to kill. I.C. § 35-50-2-9(b)(5). In March 2006, without the benefit of a plea agreement, Krempetz pleaded guilty as charged. Judgment was entered accordingly.[1]

Thereafter, the trial court conducted the sentencing phase of trial. After presentation of evidence and consideration of counsels' arguments the trial court concluded the State proved

---

[1] In two separate proceedings and under terms of negotiated plea agreements McDonald was sentenced to a total executed term of sixty-two years and Stone was sentenced to a total executed term of one-hundred years.

beyond a reasonable doubt two of the three statutory aggravating factors. Finding the aggravating circumstances outweighed Krempetz's proffered mitigating circumstances the trial court imposed a sentence of life imprisonment without parole. The trial court also imposed a forty-five-year term of imprisonment for the conspiracy to commit murder conviction and a twenty-year term for the criminal confinement conviction. The trial court ordered these sentences to be served consecutively.

Krempetz now seeks review. Pursuant to Indiana Appellate Rule 4(A)(1)(a), this Court has mandatory and exclusive jurisdiction over this appeal. Additional facts are discussed below where necessary.

## Discussion

## I.

## Sufficiency of Evidence

The trial court determined that the State proved beyond a reasonable doubt the existence of two alleged statutory aggravating factors: Krempetz intentionally killed while committing or attempting to commit robbery, I.C. § 35-50-2-9(b)(1)(G), and Krempetz committed the murder while lying in wait. I.C. § 35-50-2-9(b)(3).[2] Krempetz contends the trial court erred in doing so because the evidence was insufficient to support either aggravator.

Our standard of review for examining the sufficiency of the evidence to support a statutory aggravating circumstance is the same standard for determining the sufficiency of evidence to convict. Washington v. State, 808 N.E.2d 617, 626 (Ind. 2004). We examine the evidence tending to support the verdict and all reasonable inferences therefrom without weighing the evidence or assessing witness credibility. Id. We determine whether the evidence constitutes substantial evidence of probative value from which a reasonable trier of fact could find the existence of the aggravator beyond a reasonable doubt. Fleenor v. State, 622 N.E.2d 140, 151 (Ind. 1993).

---

[2] The trial court found that the State did not prove the existence of the third alleged aggravating circumstance: the defendant committed the murder by hiring another person to kill. I.C. § 35-50-2-9(b)(5).

4

*A.     Intentional killing while committing robbery aggravator*

Krempetz does not dispute that a robbery occurred. Focusing on the point in time at which $200 was withdrawn from Keim's account and the fact that the shooting occurred much later and at a different location, Krempetz contends "the robbery had been completed a sufficient amount of time before the murder so as to place the act of murder outside the course of the robbery." Br. of Appellant at 8. Therefore, according to Krempetz, the killing did not occur "while" committing robbery.

We addressed a similar claim in <u>Davis v. State</u>, 477 N.E.2d 889 (Ind. 1985). In that case the defendant pleaded guilty to two counts of murder and two counts of attempted murder. Sentencing was left to the trial court. The State sought the death penalty based on two aggravating factors: (1) the murders were committed while committing child molesting and (2) the murders were committed while lying in wait. Briefly stated the evidence to support the aggravators showed that as for one of the victims the defendant tied a wire around the victim's hands and neck, took him to a weeded area, molested him and then fatally choked him with his hands. As for the other victim, the evidence showed the defendant accosted the victim who was asleep in a tent during a camping trip. The defendant awoke the victim, forced the victim to walk away from the campsite, tied the victim with wire and molested him. The defendant then walked the victim further away from the campsite and at some point fatally strangled the victim with a piece of wire. Finding the existence of both aggravating circumstances as to both victims, the trial court imposed a sentence of death on the two counts of murder. On appeal, the defendant argued among other things that the evidence was not sufficient to prove that the murders were committed "while committing the underlying felony of child molesting." <u>Id.</u> at 894. According to the defendant the molestations were completed in each case before the murder occurred and therefore the two murders were not committed while committing the underlying offenses. Rejecting this claim this Court declared:

> We do not agree with defendant's narrow interpretation of the word "while." Although we have not previously considered this word as it is used in the death penalty statute, we have repeatedly found that the phrase "while committing" denotes a continuing chain of events under our felony-murder statute. In other words,

5

> when there is a close proximity in terms of time and distance between the underlying felony and the homicide and there is no break in the chain of events from the inception of the felony to the time of the homicide, we treat the two events as part of one continuous transaction.

Id. This Court concluded that in both cases the underlying felonies and the homicides "were so closely connected in time, place, and continuity of action as to be one continuous transaction." Id. at 895. Seizing upon this language, Krempetz argues that the disparity of time and place in this case precludes a finding that the killing occurred while committing the robbery.

Krempetz's argument is premised on the notion that the robbery was complete at the precise moment that money was taken from Keim's account at the ATM. But the law in this area is not quite as straightforward as Krempetz suggests. The determination of whether a killing occurred while committing a robbery is governed by the concepts of asportation and continuous transaction. Eddy v. State, 496 N.E.2d 24, 28 (Ind. 1986). A robbery is not complete until the property has been carried away. Stroud v. State, 272 Ind. 12, 395 N.E.2d 770, 771 (1979). And asportation – the carrying away of the property – continues as the perpetrators depart from the place where the property was seized. Young v. State, 725 N.E.2d 78, 81 (Ind. 2000). A crime that is continuous in its purpose and objective is deemed to be a single uninterrupted transaction. Eddy, 496 N.E.2d at 28; Neal v. State, 214 Ind. 328, 14 N.E.2d 590, 597 (1938). And a homicide and robbery are deemed to be one continuous transaction when they are closely connected in time, place, and continuity of action. Thompson v. State, 441 N.E.2d 192, 194 (Ind. 1982).

In this case it is true that the victim's money was first taken from her at the site of the ATM. But it was carried away from that location and did not come to rest until after Keim was fatally shot and Krempetz received a share of the robbery proceeds. This was a continuing chain of events from the inception of the robbery to the murder that was closely connected in time and distance. The law therefore treats the two events as part of one continuous transaction.[3] We

---

[3] The continuing nature of this transaction is further underscored by the trial court's finding that after the killing, Krempetz used Keim's debit card to obtain more money from her account and also returned to Keim's apartment taking her jewelry and car. App. at 102, 125.

6

conclude that the evidence before the trial court was sufficient to support its finding that the State proved beyond a reasonable doubt that Krempetz intentionally killed Keim while committing or attempting to commit robbery.

B.      *Intentional killing while lying in wait aggravator*

"Lying in wait involves the elements of watching, waiting, and concealment from the person killed with the intent to kill or inflict bodily injury upon that person." Washington, 808 N.E.2d at 626 (quotations omitted). Challenging the sufficiency of the evidence to support the lying in wait aggravator, Krempetz makes two claims: (1) there was no evidence of "waiting" because the amount of time that he and McDonald hid in the stairwell was only momentary and (2) there was no nexus between the murder and the alleged lying in wait because "[t]he connection became too attenuated over the substantial period of time that elapsed." Br. of Appellant at 13.

Krempetz's first claim is not well taken. We have determined "[t]he lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." Davis, 477 N.E.2d at 895 (quotation omitted); see also Washington, 808 N.E.2d at 628 (finding sufficient evidence for the existence of the lying in wait aggravator despite the attack occurring "only a short amount of time" after concealment). In this case the record does not reveal exactly how long Krempetz hid in the stairwell before ambushing his victim. But the record is clear that his decision to do so was not made impulsively or on the spur of the moment. As the trial court found, the plan was "carefully crafted by Stone, Krempetz, and McDonald because they knew that Mrs. Keim would not open her residence door to admit Mr. Krempetz. Mrs. Keim did not want her daughter associating with Spenser A. Krempetz. Mrs. Keim had previously asked Mr. Krempetz to leave her residence. Thus Stone and Krempetz knew Krempetz would have to be hiding and lying in wait before Mrs. Keim would open her door." App. at 120. The evidence supports the trial court's finding and is sufficient to demonstrate a state of mind on the part of Krempetz equivalent to that of premeditation or deliberation.

In support of his second claim – that there was no nexus between the murder and the allegation of lying in wait – Krempetz cites Ingle v. State, 746 N.E.2d 927 (Ind. 2001). In that case the defendant was charged with murder and the State sought the death penalty based on two statutory aggravators, one of which was lying in wait. The evidence showed that in the early morning hours of the killing, the defendant threw a brick through the windshield of his estranged wife's car. He then hid in a nearby tree and watched as his wife arrived and talked to the police about the incident. After the police left and his wife went into a nearby pub, the defendant hid a handgun in a nearby tree and left. The defendant then rode to a Goodwill store where he purchased clothing to be used as a disguise. Thereafter the defendant returned to the tree, retrieved the handgun, walked into the pub, and shot his wife. We determined that while the defendant watched, waited and concealed himself in a tree, his concealment did not constitute any part of the murder by lying in wait. Id. at 941. Rather, because the defendant left his place of concealment, walked to a nearby campsite, rode to the Goodwill store, and walked into the pub where the fatal shooting occurred, we reasoned that the concealment was not used as a "direct means to attack or gain control of the victim." Id. at 940 (quotation omitted). We also observed that "a *substantial amount of time passed* between his concealment in the tree and the killing" and therefore did not contribute to the lying in wait charge. Id. (emphasis added).

Contrary to Krempetz's argument, Ingle does not stand for the proposition that a lapse of time between the concealment and the killing is dispositive of whether the crime was committed while lying in wait. In addition to Ingle we have on other occasions also mentioned temporality in connection with the lying in wait aggravator. See, e.g., Davis, 477 N.E.2d at 897 (noting the "sufficient proximity of time and place to defendant's concealment"); Washington, 808 N.E.2d at 628 (observing that not only did the attack occur almost immediately after the defendant emerged from hiding, but also "only a short amount of time elapsed" between the concealment and the killing). But neither of these cases stands for the proposition that Krempetz advances. Rather, at stake in each case was whether the concealment was used as a direct means to attack or gain control of the victim. As Ingle itself recounted, where the concealment is used "as a direct means to attack or gain control of the victim" there is "a nexus between the watching, waiting, and concealment and the ultimate attack." Ingle, 746 N.E.2d at 940 (citing Davis, 477 N.E.2d at 897). "This aggravating circumstance serves to identify the mind undeterred by

contemplation of an ultimate act of violence against a human being and, of equal importance, the mind capable of choosing to commit that act upon the appearance of the victim." Taylor v. State, 695 N.E.2d 117, 120 (Ind. 1998) (quoting Thacker v. State, 556 N.E.2d 1315, 1325 (Ind. 1990)). It has been construed as intending to identify those who engage in conduct constituting watching, waiting and concealment with the intent to kill, and then choosing to participate in the ambush upon the arrival of the intended victim. Thacker, 556 N.E.2d at 1325. In essence, evidence of close proximity in time and place between the concealment and the ultimate killing provides support for the conclusion that the concealment was used as a direct means of attack. However, the absence of such evidence does not lead to a conclusion that there was no lying in wait. See, e.g., Davis v. State, 598 N.E.2d 1041, 1046 (Ind. 1992) (finding sufficient evidence to support lying in wait aggravator where defendant broke into victim's home, hid behind a door, tied her hands, took her to nearby railroad tracks under a bridge, and fatally stabbed her).

In this case the evidence shows that Krempetz watched and waited for Keim, concealing himself in the stairwell next to her apartment. The evidence also shows that Krempetz's act of concealment was used as the direct means to attack or gain control over Keim. This evidence is sufficient to support the conclusion that the killing – the ultimate attack – was committed while lying in wait. Krempetz's sufficiency of the evidence argument thus fails.

## II.
### Weighing of Aggravators and Mitigators

A sentence of life without parole is subject to the same statutory standards and requirements as the death penalty. Cooper v. State, 854 N.E.2d 831, 838 (Ind. 2006); Ajabu v. State, 693 N.E.2d 921, 936 (Ind. 1998). Under the death penalty statute, following the entry of judgment on a plea of guilty, the trial court proceeds to the sentencing phase of trial. I.C. § 35-50-2-9(d). Before death or life imprisonment can be imposed, the State is required to prove beyond a reasonable doubt at least one aggravating circumstance listed in subsections (b)(1) through (b)(16) of the statute. I.C. § 35-50-2-9(a); see also Brown v. State, 783 N.E.2d 1121, 1127 (Ind. 2003). In making its sentencing determination, the trial court must find not only that the State has proven the existence of an alleged aggravator beyond a reasonable doubt, I.C. § 35-

9

50-2-9(*l*)(1), but also that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.  I.C. § 35-50-2-9(*l*)(2). [4]

Krempetz contends the trial court erred when it determined that the statutory aggravating circumstances supporting his sentence of life without parole outweighed his proffered mitigating circumstances.  He also complains that the trial court did not properly weigh aggravating and mitigating circumstances when it imposed enhanced sentences for conspiracy to commit murder and criminal confinement.

This latter claim is not available for review.  We recently observed that as a result of the 2005 amendments to Indiana's criminal sentencing statutes, "the trial court no longer has any obligation to 'weigh' aggravating and mitigating factors against each other when imposing a sentence."  Anglemyer v. State, 868 N.E.2d 482, 491 (Ind. 2007).  Consequently, we concluded, "a trial court can not now be said to have abused its discretion in failing to 'properly weigh' such factors."  Id.  This proposition however is applicable only to the general sentencing statute which provides in part that a trial court "may impose any sentence that is . . . authorized by statute; and . . . permissible under the Constitution of the State of Indiana . . . regardless of the presence or absence of aggravating circumstances or mitigating circumstances."   I.C.  §  35-38-1-7.1(d).  Therefore, as to Krempetz's contentions concerning his non-capital convictions, his argument must fail.

A  much  different  rule  applies  under  Indiana's  capital  sentencing  scheme.   The requirement for sentencing findings is more stringent in cases under our capital statute than in non-capital cases.  Leone v. State, 797 N.E.2d 743, 748 (Ind. 2003).  When imposing a sentence of life without parole, the trial court's sentencing statement:

> (i) must identify each mitigating and aggravating circumstance
> found, (ii) must include the specific facts and reasons which lead

---

[4] The defendant has a constitutional right to a jury trial on the issue of the existence of a statutory aggravator.  Ring v. Arizona, 536 U.S. 584, 609 (2002); Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Losch v. State, 834 N.E.2d 1012, 1013 (Ind. 2005).  A defendant may, however, waive his right to a jury trial and authorize a judge to act as the fact finder.  Losch, 834 N.E.2d at 1013.  The record shows that Krempetz did so in this case.  App. at 34, 95.

the court to find the existence of each such circumstance, (iii) must articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence, and (iv) must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime.

Dumas v. State, 803 N.E.2d 1113, 1122-23 (Ind. 2004). Where, as here, the penalty phase of trial is conducted before the court, without the intervention of a jury, before the trial court may impose a death sentence or a sentence of life without parole, it must find that the State has proven the existence of an alleged aggravator beyond a reasonable doubt and must find that "any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." I.C. § 35-50-2-9(*l*)(2). Thus the weighing of aggravating and mitigating circumstances remains a part of the trial court's obligation under our capital sentencing statutes. We give great deference to a court's determination of the proper weight to assign to aggravating and mitigating circumstances. Losch, 834 N.E.2d at 1014. And we will set aside the court's weighing only upon the showing of a manifest abuse of discretion. Id.

The trial court in this case found the existence of several mitigating factors but assigned them minimal weight and determined they did not outweigh the two statutory aggravators. As the trial court explained, "This Court places weight of the full, complete and highest level on the brutal, purposeful, preplanned, premeditated, senseless, unprovoked, and persistent means of murder by the intentional killing of Barbara Jo Keim." App. at 116.

The trial court acknowledged that Krempetz has no juvenile adjudications and prior to this case no adult criminal convictions. I.C. § 35-50-2-9(c)(1) (listing as a mitigating factor "[t]he defendant has no significant history of prior criminal conduct"). The court also acknowledged that "the lack of adult criminal convictions alone would be a substantial mitigator." App. at 101; see also Loveless v. State, 642 N.E.2d 974, 976 (Ind. 1994) (noting defendant's age of sixteen and lack of delinquent adjudications or criminal history "deserve substantial mitigating weight"). This mitigator was discounted, however, because of Krempetz's admitted drug use on numerous occasions, which the trial court believed evidenced "contempt for the laws of this state." App. at 101. Additionally, the trial court discounted this mitigator because Krempetz committed other crimes after he murdered Keim, including using Keim's

11

debit card and returning to Keim's apartment to take her jewelry and motor vehicle. Id. at 102. The trial court explained, "The fact that numerous crimes were committed by this Defendant's own admission (although these crimes were not reduced to convictions) certainly detracts from the mitigating nature of his actual criminal history." Id. This was the trial judge's call and we find no error. See Losch, 834 N.E.2d at 1014-15 (affirming life without parole sentence where trial court gave only minimal weight to defendant's lack of adult criminal convictions based on his "continuous use of marijuana since age 13 and the fact that he stole money from his family indicated his contempt for the laws of the state and lessened the weight of his lack of an adult criminal record as a mitigating fact").

The trial court also found that Krempetz suffered from an impaired mental condition. I.C. § 35-50-2-9(c)(2), (c)(6) (listing as mitigating factors "[t]he defendant was under the influence of extreme mental or emotional disturbance when the murder was committed" and "[t]he defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication"). Several factors bore on the trial court reaching this conclusion, including testimony from Dr. Paul Yoder, a clinical psychologist, who diagnosed Krempetz with "Bipolar I disorder, mixed, severe with psychotic features . . . Cannabis Dependence . . . Polysubstance Dependence . . . Schizoaffective Disorder . . . Post-traumatic Stress Disorder . . . [and] antisocial traits." App. at 105. Dr. Yoder also testified that Krempetz suffered from "mood swings related to mania . . . neurologic difficulty . . . psychotic features . . . possible ADHD . . . [and] possible hallucinations (after he was arrested)." Id.

After either a finding of mental illness or a plea of guilty but mentally ill, the trial court must consider several factors in determining what, if any, mitigating weight to give to any evidence of a defendant's mental illness. Smith v. State, 770 N.E.2d 818, 823 (Ind. 2002). The factors include: (1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime. Id. (citing Archer v. State, 689 N.E.2d 678, 685 (Ind. 1997)).

12

In this case the trial court determined that the impaired mental condition mitigator should be given minimal weight for several reasons, including: (1) there was no credible testimony that clearly linked the mitigator to the commission of the murder; (2) Krempetz's mental state at the time of the crime could not be determined; (3) there was no evidence that Krempetz is of inferior intellect; (4) Krempetz was able to function on a daily basis unhampered by debilitating mental conditions; (5) Krempetz accepted full and complete responsibility for his commission of the offense of murder entering a plea of guilty (he did not enter a plea of guilty but mentally ill or not guilty by reason of insanity); (6) Krempetz self medicated with marijuana and other illegal drugs and thus any mental condition could have been self induced; (7) his statement in allocution showed that before, during, and after the murder Krempetz was in control of his thought process and oriented as to time and place indicating that he was in control of his faculties; and (8) Dr. Yoder testified that Krempetz was manipulative, glorified his problems, and was deceptive during testing. Again, we find no error with the trial court's determination.

Krempetz also advanced several other factors in mitigation. I.C. § 35-50-2-9(c)(8) (listing as a mitigating factor "[a]ny other circumstances appropriate for consideration"). They included: (1) Krempetz was eighteen years of age when the crime was committed; (2) he was sexually abused as a child; (3) he was exposed to domestic violence; (4) he was exposed to drugs and alcohol as a way of life; (5) facilitation by Hannah Stone who provided a reason to commit the crime; and (6) facilitation by Aaron McDonald who provided the handgun. The trial court agreed that these factors were mitigating, but assigned them minimal weight for a number of reasons, including: (1) Krempetz is over eighteen years of age at the time of sentencing and is considered an adult under Indiana law; (2) Krempetz does not rely on his sexual victimization as a child or observations of domestic violence as an excuse; rather he claims to have done this act to please his girlfriend Hannah Stone; (3) by Krempetz's own admission there was no nexus between drug/alcohol use and the murder of Keim; and (4) the alleged facilitation by Stone and McDonald did not mitigate Krempetz's action in shooting the victim. Krempetz was in a position to stop the plan from being completed, and he chose not to do so.

The trial court is not "required to give the same weight to proffered mitigating factors as the defendant does." Gross v. State, 769 N.E.2d 1136, 1140 (Ind. 2002). In this case the trial

13

court's sentencing statement presents a detailed appraisal of the mitigating factors that Krempetz advanced for consideration. The trial court balanced the mitigators against the charged aggravators – intentional killing while committing or attempting to commit robbery and murder while lying in wait – and concluded that each of the charged aggravators outweighed the mitigators. The trial court acted well within its discretion. We find no abuse.

## III.
## Review of Sentence

For his final claim Krempetz seeks revision to a term of years of his life without parole sentence. Relying on the same argument to support a revision of his LWOP sentence, Krempetz also seeks a reduction of his forty-five-year sentence for conspiracy to commit murder, a Class A felony, and his twenty-year sentence for criminal confinement while armed with a deadly weapon, a Class B felony.

Article VII, Section 4 of the Indiana Constitution provides that, "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to . . . review and revise the sentence imposed." Our rules authorize revision of a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "[A] defendant must persuade the appellate court that his or her sentence has met this inappropriateness standard of review." Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Concerning the nature of the offense, Krempetz focuses on his girlfriend, Hannah Stone, and complains among other things that she was the "central wrongdoer in the commission of this offense." Br. of Appellant at 26. According to Krempetz, he "was a young man who was trying to do his girlfriend's bidding . . . . He was trying to make himself useful, and probably trying to impress her that he could be counted on to do the tough things that she didn't want to do." Id. Although these factors may have some bearing on Krempetz's character by showing that he is easily manipulated and unable to resist the entreaties of others, it is not readily apparent what bearing they have on the nature of the offense. As we see it, this was a carefully planned, brutal,

14

execution style killing that was committed against a defenseless victim whose only transgression was disapproval of her daughter's choice of acquaintances.

As for the character of the offender Krempetz presents for our consideration essentially the same factors that he presented in mitigation to the trial court: his age; his lack of a prior criminal record; his expression of remorse; that he was not taking his medication at the time of the offense; that he was the victim of domestic violence as a child; and that he is bipolar. Id. at 26-28. We find nothing in this presentation to justify revising Krempetz's sentences. We also note that contrary to Krempetz's claim that he acted under the substantial domination of his girlfriend, the trial court recounted Krempetz's statements, where he said among other things, "This is nobody's fault but my own . . . . Nobody twisted my arm, and I was - - I was only convinced that at the time it was the thing to do . . . . To think that we thought we would get away with it. So stupid. What we did was senseless." App. at 117. The trial court also found that Krempetz was "deceptive" and "manipulative." Id. at 118. We are persuaded that neither the nature of the crimes Krempetz committed nor his character renders his sentence inappropriate.

## Conclusion

We affirm the judgment of the trial court.

Shepard, C.J., and Dickson, Sullivan and Boehm, JJ., concur.

15